IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MEGAN GAHAN,

    Plaintiff,

vs.                                                       Civ. No. 12-1297 KG/SCY

BRODERICK SHARP, SEAN CONNORS,
ANTHONY MEDRANO,
and COLLEEN BULTMAN,

    Defendants.

MEMORANDUM OPINION AND ORDER

    This matter comes before the Court upon County Defendants' Motion for Partial Summary Judgment No. I on Gahan's Count II Alleging Battery and False Imprisonment Under the New Mexico Tort Claims Act (Motion for Partial Summary Judgment), filed on December 6, 2013.  (Doc. 74).  Plaintiff filed a response on January 6, 2014, and Defendants filed a reply on January 23, 2014.  (Docs. 81 and 88).  Having considered the Motion for Partial Summary Judgment, the accompanying briefs, and the material evidence of record, the Court (1) grants the Motion for Partial Summary Judgment in part, and (2) denies Defendants' request for an award of attorneys' fees and costs.

A. *Summary of Material Facts Viewed in the Light Most Favorable to Plaintiff*

    This lawsuit arises from the allegedly unlawful seizure and search of Plaintiff which occurred on September 14, 2011, in Albuquerque, New Mexico, by members of the Bernalillo County Sheriff's Office (BCSO).  Plaintiff brings both 42 U.S.C. § 1983 and New Mexico Tort Claims Act (NMTCA) claims in this lawsuit.

At 9:19 a.m. on September 14, 2011, Defendant BCSO Sergeant Broderick Sharp obtained a search warrant for 6604 Kelly NE in Albuquerque. (Doc. 74-3) at 1. Sharp's affidavit in support of the search warrant states that Sharp sought to search the residence as well "as any and all vehicles on the property owned or operated by the residents and/or occupants of the residence" for drugs and weapons, among other things. *Id*. at 2. The target of the search warrant was Shanna Tencza who was observed driving her vehicle from 6604 Kelly NE to deliver drugs. *Id.* at 3; (Doc. 74-2) at 2, depo. at 13.

After Sharp wrote the affidavit, he determined that a house across the street from 6604 Kelly NE also appeared to be a "drug house." (Doc. 74-2) at 2, depo. at 11. Because Sharp might raid this second house at some point, he did not want to raid the 6604 Kelly NE residence and possibly tip off his tactics to the occupants of the second house. *Id.* In addition, Sharp did not want to raid the 6604 Kelly NE residence because he had previously seen children and a dog in the residence's yard. *Id.*; (Doc. 88-3) at 2, depo. at 23; (Doc. 81-2) at 2, depo. at 25. Consequently, Sharp decided to have a deputy conduct a traffic stop of Tencza while she was away from the residence and then have her brought back to the residence to execute the search warrant. (Doc. 74-2) at 3, depo. at 15. Sharp believed that when an officer is going to execute a search warrant on a residence, the officer can "stop the vehicle and detain all occupants of the vehicle until [the officer has] a reasonable grasp of what each person's role in [the] search warrant or [the] investigation dictates." (Doc. 74-2) at 12, depo. at 75.

At about 10:00 a.m. on September 14, 2011, Sharp contacted Defendant BCSO Detective Anthony Medrano to observe 6604 Kelly NE for anyone leaving the residence. (Doc. 74-1) at 4. At about 11:00 a.m., Medrano saw Tencza drive her vehicle from the residence. (Doc. 74-1) at 4. Plaintiff apparently left the residence with Tencza and was a passenger in her vehicle.

2

Deputies told Defendant BCSO Deputy Sean Connors to conduct a traffic stop of Tencza's vehicle because Tencza was the target of a search warrant. (Doc. 74-5) at 5, depo. at 39-40. In fact, Sharp told Connors that the search warrant for the residence included vehicles. (Doc. 81-5) at 2, depo. at 20. Medrano and Connors, in separate vehicles, followed Tencza's vehicle for 1.1 miles. (Doc. 74-9). At that point, Connors stopped the vehicle at a hotel parking lot so that Sharp and his team could catch up to the vehicle and take over the investigation. (Doc. 74-1) at 4; (Doc. 79-1) at 2, depo. at 28. Connors believed that the search warrant for the residence provided him with the lawful authority to stop the vehicle and to detain the occupants of the vehicle. (Doc. 74-5) at 6, depo. at 46-48.

Connors asked for Tencza and Plaintiff's identification as well as for proof of insurance and the vehicle's registration. (Doc. 79-1) at 3 and 5, depo. at 34 and 70. Connors also asked Plaintiff not to make a cell phone call and he took both Tencza and Plaintiff's cell phones. (Doc. 79-1) at 3 and 5, depo. at 34 and 71. Connors told Plaintiff that he took the cell phones for his own safety. (Doc. 81-4) at 4. About a minute after Connors pulled over the vehicle, Sharp and the others started to arrive at the parking lot. (Doc. 79-1) at 3, depo. at 34-35. Connors then took Tencza out of the vehicle and handcuffed her. (Doc. 79-1) at 5, depo. at 71.

When Medrano arrived at the parking lot, he intended to secure Tencza's vehicle and detain the passenger pursuant to the execution of the search warrant. (Doc. 83-2) at 4, depo. at 93. Medrano and an unknown deputy with a baseball cap grabbed and dragged Plaintiff out of the vehicle and Connors handcuffed Plaintiff shortly thereafter. (Doc. 74-7) at 11, depo. at 252-53. Plaintiff does not know who grabbed her because they came from behind. (Doc. 74-7) at 11, depo. at 253. Medrano had a mask on during the encounter at the parking lot and was screaming

at Plaintiff as well as calling her a name.  (Doc. 74-8) at 2, depo. at 112-13.  Once handcuffed, both Tencza and Plaintiff were advised of their *Miranda* rights.  (Doc. 74-1) at 4.

Plaintiff later sprained her wrist while at the parking lot when either Medrano, the unknown deputy with the baseball cap, or Defendant BCSO Deputy Colleen Bultman pulled her handcuffs.  (Doc. 74-7) at 11-12, depo. at 253-55.  The handcuffs themselves were uncomfortable but not painful.  (Doc. 74-7) at 12, depo. at 256-57.

Tencza subsequently informed Sharp that she would cooperate with the deputies, but she did not want people to see her speaking with law enforcement officers.  (Doc. 74-2) at 5, depo. at 36.  In response, Sharp agreed to take Tencza to the North Substation where Tencza could speak more openly with Sharp.  (Doc. 74-2) at 5, depo. at 36-37.  Sharp decided to take Plaintiff to the North Substation as well because he did not want her to go back to 6604 Kelly NE where Sharp believed drugs were located.  (Doc. 74-2) at 9, depo. at 55.  He also did not want Plaintiff to take Tencza's vehicle which he suspected of being involved in drug trafficking.  (Doc. 74-2) at 9, depo. at 55.  In addition, Sharp intended to interview Plaintiff at the North Substation.  (Doc. 74-2) at 9, depo. at 56.

Sharp then contacted dispatch to request a female officer to search Tencza and Plaintiff for contraband prior to transporting them to the North Substation.  (Doc. 74-2) at 5-6, depo. at 36 and 38.  Sharp knew, at that point, that Tencza delivered drugs and that she may have hidden drugs "in places that male officers couldn't go and retrieve."  (Doc. 74-2) at 5, depo. at 36.  Although Sharp did not have any knowledge that Plaintiff had drugs on her, in Sharp's experience and training, a person with drugs who is stopped by law enforcement officers may pass the drugs to another person in the vehicle, such as Plaintiff.  (Doc. 74-2) at 8, depo. at 48; (Doc. 81-2) at 5, depo. at 54.  Sharp also did not have a reason to believe that Plaintiff was

4

armed. (Doc. 81-2) at 5, depo. at 54. Nonetheless, Standard Operating Procedure (SOP) required that prisoners be searched prior to being transported. (Doc. 74-2) at 8, depo. at 48.

Bultman arrived shortly thereafter to search Tencza and Plaintiff for drugs and weapons. (Doc. 74-2) at 6, depo. at 38; (Doc. 79-4) at 2, depo. at 22. Bultman also believed that Plaintiff was being detained pursuant to the search warrant. (Doc. 74-10) at 6, depo. at 52. Sharp did not ask Bultman to perform a patdown search nor a strip search. (Doc. 74-2) at 6, depo. at 41; (Doc. 83-1) at 7, depo. at 65. Sharp expected that Bultman would search Plaintiff's pockets, bras, socks, and the seams of her pants and underwear. (Doc. 74-2) at 7, depo. at 43-45.

Medrano also apparently asked Bultman to search Plaintiff. (Doc. 83-2) at 9, depo. at 111-12. He informed Bultman that the deputies were there in connection with a narcotics search warrant. (Doc. 83-2) at 9, depo. at 113. Medrano expected Bultman to search Plaintiff where she thought it would be feasible for Plaintiff to hide narcotics. (Doc. 83-2) at 10, depo. at 114-15.

The search took place to the side of the motel in the parking lot to avoid the roadway. (Doc. 74-2) at 6, depo. at 41. Plaintiff remained in handcuffs during the search which lasted 1 to 1.5 minutes. (Doc. 79-4) at 5 and 8, depo. at 44 and 54. Deputies did not search Tencza's vehicle because of her cooperation.[1] (Doc. 81-2) at 6, depo. at 66. The entire encounter at the parking lot lasted about 90 minutes.[2] (Doc. 83-3) at 2, depo. at 39.

Connors drove Plaintiff to the North Substation but would not say where they were going except that they were going to a certain intersection. (Doc. 81-4) at 2. Plaintiff felt that she was

---

[1] Medrano, however, testified at his deposition that he searched the vehicle for five to ten minutes while Sharp questioned Tencza and Plaintiff at the parking lot. (Doc. 81-3) at 6, depo. at 106-108.

[2] Medrano, on the other hand, testified at his deposition that he was in the parking lot a total of maybe 30 minutes. (Doc. 83-2) at 10, depo. at 117.

5

going somewhere to be assaulted and killed. (Doc. 81-4) at 3-4. Although Connors told Plaintiff that he took Plaintiff's cell phone for his own protection, Plaintiff believed that Connors was a "fake officer" and had taken her cell phone so she could not call for help. (Doc. 81-4) at 4. Plaintiff, however, also noted that Conners treated her professionally and respectfully, and that he did not do anything improper. (Doc. 74-7) at 8 and 10, depo. at 167-68 and 219.

Once at the North Substation, Sharp and Medrano spoke with Tencza and Plaintiff, individually, in an office. (Doc. 74-2) at 10, depo. at 68; (Doc. 79-3) at 5, depo. at 123. When not being interviewed, Plaintiff was placed in a holding cell. (Doc. 79-3) at 5-6, depo. at 124-26. Additionally, Plaintiff's hands remained cuffed in front of her for the entire time she was at the substation. (Doc. 95-1) at 3, depo. at 69-70. Deputies subsequently left the North Substation with Tencza so she could show them the location of her supplier. (Doc. 74-2) at 10, depo. at 68-69. Deputies then took Tencza to execute the search warrant at 6604 Kelly NE. (Doc. 74-2) at 5, depo. at 35. At 4:05 p.m., the search warrant for 6604 Kelly NE was executed as well as a search warrant for the house across the street.[3] (Doc. 83-2) at 2 and 14, depo. at 47 and 131. According to Plaintiff, she remained at the North Substation and was not released from the North Substation until maybe 4:30 p.m. that afternoon (Doc. 74-7) at 13, depo. at 266.

Finally, Plaintiff attempts to discredit Sharp's credibility by presenting unsubstantiated deposition testimony by Nathan Harger that Sharp is a liar, that he has committed fraudulent acts, and that he discriminates against individuals on the basis of race. (Doc. 81-1) at 2; (Doc. 88-1) at 2-3, depo. at 17-18. Attacks on credibility, however, are misplaced because "'a judge

---

[3] Although Sharp's search inventory log indicates that the search warrant was executed at 11:59 a.m. on September 14, 2011, Tencza testified at her deposition that after she and Plaintiff were released from the North Substation at maybe 4:00 p.m., they drove back to 6604 Kelly NE with a deputy who retrieved a box from Tencza at the residence. (Doc. 74-8) at 5, depo. at 166; (Doc. 79-5) at 3, depo. at 194-95. According to Tencza, that was the extent of the "search." (Doc. 79-5) at 3, depo. at 195.

6

may not evaluate the credibility of witnesses in deciding a motion for summary judgment.'" *Faragalla v. Douglas County School Dist. RE 1*, 411 Fed. Appx. 140, 147 (10th Cir. 2011) (quoting *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000)).

*B. The Amended Complaint for the Recovery of Damages Caused by the Deprivation of Civil Rights (Amended Complaint) (Doc. 21)*

At issue in the Motion for Partial Summary Judgment are Counts II and III of the Amended Complaint. In Count II, Plaintiff brings NMTCA battery claims against Connors, Medrano, and Bultman. In Count III, Plaintiff brings NMTCA false imprisonment and false arrest claims against each of the Defendants. Only Connors and Medrano move for summary judgment on the battery claims while all Defendants move for summary judgment on the false imprisonment claims. Consequently, neither the battery claim against Bultman nor the false arrest claims are before the Court. To the extent that Plaintiff seeks punitive damages for the NMTCA claims under Counts II and III, Defendants also move for summary judgment on those claims.

*C. Standard of Review*

Summary judgment is appropriate if there is no genuine dispute as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).[4] When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come

---

[4]Rule 56 was amended effective December 1, 2010, but the standard for granting summary judgment remains unchanged.

forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

D.  Discussion

As a preliminary matter, Defendants argue that the federal civil rights defense of qualified immunity applies equally to state tort claims like battery and false imprisonment.  New Mexico courts, however, have not determined that qualified immunity provides a defense for officials under the NMTCA.  *Romero v. Sanchez*, 1995-NMSC-028, ¶ 25, 119 N.M. 690 (question of applicability of qualified immunity to NMTCA not addressed by New Mexico Supreme Court).  Without a clear mandate from the New Mexico courts to apply qualified immunity to the NMTCA, this Court declines to do so.  *See Todd v. Montoya*, 877 F.Supp.2d 1048, 1106 (D.N.M. 2012) ("qualified immunity does not apply to claims brought under the NMTCA.").

*1.  The Count II Battery Claims Against Connors and Medrano*

In New Mexico, "[b]attery occurs when an individual 'acts intending to cause a harmful or offensive contact with the person….'" *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1208-09 (10th Cir. 2006) (quoting *State v. Ortega*, 1992-NMCA-003, ¶ 12, 113 N.M. 437 (citation omitted)).  "Any bodily contact is offensive 'if it offends a reasonable sense of personal dignity.'"  *Id.* at 1209 (quoting Restatement (Second) Torts § 19).  In the context of police officers, "officers [who] act in good faith and use no more force than reasonably necessary to

preserve the peace, … are accorded reasonable latitude in the use of force." *State v. Prince*, 1999-NMCA-010, ¶ 12, 126 N.M. 547. The reasonableness of the use of force is measured "from the perspective of the officer on the scene, with the understanding that officers must often make split-second decisions in difficult situations." *Archuleta v. Lacuesta*, 1999-NMCA-113, ¶ 8, 128 N.M. 13.

### a. The Battery Claim Against Connors

In this case, there is no evidence to suggest that Connors used unreasonable force when he handcuffed Plaintiff or at any other time. Connors is, therefore, entitled to summary judgment on the Count II battery claim.

### b. The Battery Claim Against Medrano

Medrano argues that he is entitled to summary judgment on the battery claim because Plaintiff cannot positively identify Medrano as the deputy who grabbed her from behind nor can she state who injured her wrist. This question of causation, however, is a question of fact suitable for the jury to decide. *See Silva v. Lovelace Health Sys., Inc.*, 2014-NMCA-086, ¶ 49, 331 P.3d 958. Once the jury decides the causation question, then, if necessary, the jury must decide if Medrano lacked good faith in using more force than reasonably necessary when he interacted with Plaintiff in the parking lot. *St. John v. McColley*, 653 F. Supp. 2d 1155, 1165 (D.N.M. 2009) (jury determines whether defendants accused of battery "are protected by having acted reasonably and in good faith."). Summary judgment is, therefore, inappropriate with respect to the Count II battery claim against Medrano.

### 2. The Count III False Imprisonment Claims Against All Defendants

In New Mexico, "false imprisonment consists of intentionally confining or restraining

another person without his consent and with knowledge that he has no lawful authority to do so." NMSA 1978, § 30-4-3 (2004 Repl. Pamp.). "A defendant possessed of a good faith and reasonable belief in the lawfulness of the action is not liable for false imprisonment…." *Fuerschbach*, 439 F.3d at 1207. Summary judgment cannot be granted with respect to a false imprisonment claim if there is a question of fact regarding whether a defendant had reasonable cause to detain a plaintiff. *Diaz v. Lockheed Electronics*, 1980-NMCA-140, ¶ 7, 95 N.M. 28.

Defendants argue that they believed, in good faith, that their authority to detain Plaintiff arose from the search warrant for the residence and from existing law. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendants had a good faith belief. The question, therefore, is whether a reasonable jury, in viewing the evidence in the light most favorable to Plaintiff, could find that Defendants did not have reasonable cause to detain Plaintiff.

As of September 14, 2011, an officer would have known that "[a]s long as a person is an occupant of the premises identified in a search warrant, officers have 'categorical' authority to detain him or her for the duration of the search." *United States v. Johnson*, 414 F. App'x 176, 179 (10th Cir. 2011) (quoting *Muehler v. Mena*, 544 U.S. 93, 98 (2005)). Additionally, the Tenth Circuit decided a case in 2007 with some similarities to this one. In *United States v. Castro-Portillo*, a magistrate judge issued a residential search warrant for drugs, money, guns, and other items. 211 Fed. Appx. 715, 717 (10th Cir. 2007). Castro-Portillo, the criminal defendant, was not named as a target in the search warrant. *Id.* During surveillance of the residence, a law enforcement agent saw Castro-Portillo at the residence. *Id.* Shortly thereafter, an officer saw a man and woman leave the residence in a car and begin to drive away. *Id.* The officer stopped the car two blocks from the residence because he believed the target of the search

warrant was in the vehicle.  *Id.*  In fact, Castro-Portillo was driving the vehicle and his wife was a passenger.  *Id.*  The officer also believed that since the vehicle left the target house there may be guns or drugs in the vehicle. *Id.*  For safety reasons, the officer ordered Castro-Portillo to exit the vehicle, handcuffed him, and conducted a weapons search.  *Id.*  Castro-Portillo and his wife were then taken back to the residence where authorities were searching the residence.  *Id.*  Once authorities concluded the search, they transported Castro-Portillo to the police station where he admitted to illegal activities.  *Id.* at 717-18.

> The Tenth Circuit held that
>
> it is plain the search warrant in this case carried with it the limited authority to detain Mr. Castro–Portillo as an occupant during the search of the house. This alone was sufficient to detain him during the entirety of the search. The fact he was not observed committing a crime at the time of the stop, drove away from the house moments before the execution of the search warrant, and did not know about the search warrant did not prevent authorities from having the requisite suspicion to stop him….

*Id.* at 721.  Moreover, the Tenth Circuit noted that the officer detained Castro-Portillo as soon as practicable after he left the residence.  *Id.*  The Tenth Circuit further concluded that Castro-Portillo's "handcuffed detention was justified by a substantial governmental interest in minimizing the risk of harm to authorities who reasonably believed he might possess a gun or otherwise might present some danger to the officers during the course of the entire search, both while he was detained street-side and later when authorities returned him to the house." *Id.* at 723.

Plaintiff contends that neither *Castro-Portillo* nor any other case involves the particular factual situation that occurred here.  Unfortunately, it is rare to find a case exactly on point both legally and factually.  In this case, a reasonable jury could find that (1) there was a search warrant for 6604 Kelly NE; (2) Plaintiff was an occupant of 6604 Kelly NE;  and (3) Connor pulled Tenzca's vehicle over as soon as practicable.  Under these circumstances, a reasonable

11

jury could find that based on the case law available to Defendants they could have reasonably believed that they could detain Plaintiff pending the execution of the search warrant. Consequently, summary judgment is appropriate on the Count III false imprisonment claims.

       *3. Punitive Damages Claims under Counts II and III*

Defendants further argue that they are entitled to summary judgment on claim for punitive damages under Counts II and III. In fact, the NMTCA explicitly states that "[n]o judgment against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act shall include an award for exemplary or punitive damages…." NMSA 1978, § 41-4-19(D) (2013 Cum. Supp.). Defendants are, therefore, entitled to summary judgment, as a matter of law, on any claim for punitive damages under Counts II and III.

       *4. Defendants' Request for an Award of Attorneys' Fees and Costs*

Because Defendants do not prevail completely on their Motion for Summary Judgment and because Plaintiff's arguments in opposition to the Motion for Summary Judgment are not frivolous, the Court denies Defendants' request for an award of attorneys' fees and costs.

    IT IS ORDERED that

    1. County Defendants' Motion for Partial Summary Judgment No. I on Gahan's Count II Alleging Battery and False Imprisonment Under the New Mexico Tort Claims Act (Doc. 74) is granted in part;

    2. summary judgment will be entered in favor of Connors on Count II;

    3. Count II will be dismissed with prejudice as to Connors only;

    4. summary judgment will be entered in Defendants' favor on the Count III false imprisonment claims;

5. those false imprisonment claims will be dismissed with prejudice;

6. summary judgment will be entered in Defendants' favor on any punitive damages claims brought under Counts II and III;

7. those punitive damages claims will be dismissed with prejudice; and

8. Defendants' request for an award of attorneys' fees and costs is denied.

_____
UNITED STATES DISTRICT JUDGE