IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MEGAN GAHAN,

    Plaintiff,

vs.                                                        Civ. No. 12-1297 KG/SCY

BRODERICK SHARP, SEAN CONNORS,
ANTHONY MEDRANO,
and COLLEEN BULTMAN,

    Defendants.

MEMORANDUM OPINION AND ORDER

       This matter comes before the Court upon County Defendants' Motion for Partial Summary Judgment No. II on Count I of Gahan's Amended Complaint Alleging Search and Seizure Without Probable Cause (Motion for Partial Summary Judgment), filed December 19, 2013. (Doc. 75). Plaintiff filed a response on January 16, 2014, and Defendants filed a reply on February 12, 2014. (Docs. 83 and 95). Having reviewed the Motion for Partial Summary Judgment, the accompanying briefs, and the material evidence of record, the Court grants, in part, the Motion for Partial Summary Judgment.

A.  *Summary of Material Facts Viewed in the Light Most Favorable to Plaintiff*

       This lawsuit arises from the allegedly unlawful seizure and search of Plaintiff which occurred on September 14, 2011, in Albuquerque, New Mexico, by members of the Bernalillo County Sheriff's Office (BCSO). Plaintiff brings both 42 U.S.C. § 1983 and New Mexico Tort Claims Act claims.

       At 9:19 a.m. on September 14, 2011, Defendant BCSO Sergeant Broderick Sharp obtained a search warrant for 6604 Kelly NE in Albuquerque. (Doc. 74-3) at 1. Sharp's

affidavit in support of the search warrant states that Sharp sought to search the residence as well "as any and all vehicles on the property owned or operated by the residents and/or occupants of the residence" for drugs and weapons, among other things. *Id*. at 2. The target of the search warrant was Shanna Tencza who was observed driving her vehicle from 6604 Kelly NE to deliver drugs. *Id.* at 3; (Doc. 74-2) at 2, depo. at 13.

After Sharp wrote the affidavit, he determined that a house across the street from 6604 Kelly NE also appeared to be a "drug house." (Doc. 74-2) at 2, depo. at 11. Because Sharp might raid this second house at some point, he did not want to raid the 6604 Kelly NE residence and possibly tip off his tactics to the occupants of the second house. *Id.* In addition, Sharp did not want to raid the 6604 Kelly NE residence because he had previously seen children and a dog in the residence's yard. *Id.*; (Doc. 88-3) at 2, depo. at 23; (Doc. 81-2) at 2, depo. at 25. Consequently, Sharp decided to have a deputy conduct a traffic stop of Tencza while she was away from the residence and then have her brought back to the residence to execute the search warrant. (Doc. 74-2) at 3, depo. at 15. Sharp believed that when an officer is going to execute a search warrant on a residence, the officer can "stop the vehicle and detain all occupants of the vehicle until [the officer has] a reasonable grasp of what each person's role in [the] search warrant or [the] investigation dictates." (Doc. 74-2) at 12, depo. at 75.

At about 10:00 a.m. on September 14, 2011, Sharp contacted Defendant BCSO Detective Anthony Medrano to observe 6604 Kelly NE for anyone leaving the residence. (Doc. 74-1) at 4. At about 11:00 a.m., Medrano saw Tencza drive her vehicle from the residence. (Doc. 74-1) at 4. Plaintiff apparently left the residence with Tencza and was a passenger in her vehicle.

Deputies told Defendant BCSO Deputy Sean Connors to conduct a traffic stop of Tencza's vehicle because Tencza was the target of a search warrant. (Doc. 74-5) at 5, depo. at

39-40. In fact, Sharp told Connors that the search warrant for the residence included vehicles. (Doc. 81-5) at 2, depo. at 20. Medrano and Connors, in separate vehicles, followed Tencza's vehicle for 1.1 miles. (Doc. 74-9). At that point, Connors stopped the vehicle at a hotel parking lot so that Sharp and his team could catch up to the vehicle and take over the investigation. (Doc. 74-1) at 4; (Doc. 79-1) at 2, depo. at 28. Connors believed that the search warrant for the residence provided him with the lawful authority to stop the vehicle and to detain the occupants of the vehicle. (Doc. 74-5) at 6, depo. at 46-48.

Connors asked for Tencza and Plaintiff's identification as well as for proof of insurance and the vehicle's registration. (Doc. 79-1) at 3 and 5, depo. at 34 and 70. Connors also asked Plaintiff not to make a cell phone call and he took both Tencza and Plaintiff's cell phones. (Doc. 79-1) at 3 and 5, depo. at 34 and 71. Connors told Plaintiff that he took the cell phones for his own safety. (Doc. 81-4) at 4. About a minute after Connors pulled over the vehicle, Sharp and the others started to arrive at the parking lot. (Doc. 79-1) at 3, depo. at 34-35. Connors then took Tencza out of the vehicle and handcuffed her. (Doc. 79-1) at 5, depo. at 71.

When Medrano arrived at the parking lot, he intended to secure Tencza's vehicle and detain the passenger pursuant to the execution of the search warrant. (Doc. 83-2) at 4, depo. at 93. Medrano and an unknown deputy with a baseball cap grabbed and dragged Plaintiff out of the vehicle and Connors handcuffed Plaintiff shortly thereafter. (Doc. 74-7) at 11, depo. at 252-53. Plaintiff does not know who grabbed her because they came from behind. (Doc. 74-7) at 11, depo. at 253. Medrano had a mask on during the encounter at the parking lot and was screaming at Plaintiff as well as calling her a name. (Doc. 74-8) at 2, depo. at 112-13. Once handcuffed, both Tencza and Plaintiff were advised of their *Miranda* rights. (Doc. 74-1) at 4.

Plaintiff later sprained her wrist while at the parking lot when either Medrano, the unknown deputy with the baseball cap, or Defendant BCSO Deputy Colleen Bultman pulled her handcuffs. (Doc. 74-7) at 11-12, depo. at 253-55. The handcuffs themselves were uncomfortable but not painful. (Doc. 74-7) at 12, depo. at 256-57.

Tencza subsequently informed Sharp that she would cooperate with the deputies, but she did not want people to see her speaking with law enforcement officers. (Doc. 74-2) at 5, depo. at 36. In response, Sharp agreed to take Tencza to the North Substation where Tencza could speak more openly with Sharp. (Doc. 74-2) at 5, depo. at 36-37. Sharp decided to take Plaintiff to the North Substation as well because he did not want her to go back to 6604 Kelly NE where Sharp believed drugs were located. (Doc. 74-2) at 9, depo. at 55. He also did not want Plaintiff to take Tencza's vehicle which he suspected of being involved in drug trafficking. (Doc. 74-2) at 9, depo. at 55. In addition, Sharp intended to interview Plaintiff at the North Substation. (Doc. 74-2) at 9, depo. at 56.

Sharp then contacted dispatch to request a female officer to search Tencza and Plaintiff for contraband prior to transporting them to the North Substation. (Doc. 74-2) at 5-6, depo. at 36 and 38. Sharp knew, at that point, that Tencza delivered drugs and that she may have hidden drugs "in places that male officers couldn't go and retrieve." (Doc. 74-2) at 5, depo. at 36. Although Sharp did not have any knowledge that Plaintiff had drugs on her, in Sharp's experience and training, a person with drugs who is stopped by law enforcement officers may pass the drugs to another person in the vehicle, such as Plaintiff. (Doc. 74-2) at 8, depo. at 48; (Doc. 81-2) at 5, depo. at 54. Sharp also did not have a reason to believe that Plaintiff was armed. (Doc. 81-2) at 5, depo. at 54. Nonetheless, Standard Operating Procedure (SOP) required that prisoners be searched prior to being transported. (Doc. 74-2) at 8, depo. at 48.

Bultman arrived shortly thereafter to search Tencza and Plaintiff for drugs and weapons. (Doc. 74-2) at 6, depo. at 38; (Doc. 79-4) at 2, depo. at 22. Bultman also believed that Plaintiff was being detained pursuant to the search warrant. (Doc. 74-10) at 6, depo. at 52. Although Sharp did not ask Bultman to perform a patdown search neither did Sharp ask Bultman to conduct a strip search. (Doc. 74-2) at 6, depo. at 41; (Doc. 83-1) at 7, depo. at 65. Sharp expected that Bultman would search Plaintiff's pockets, bras, socks, and the seams of her pants and underwear. (Doc. 74-2) at 7, depo. at 43-45.

Medrano also apparently asked Bultman to search Plaintiff. (Doc. 83-2) at 9, depo. at 111-12. He informed Bultman that the deputies were there in connection with a narcotics search warrant. (Doc. 83-2) at 9, depo. at 113. Medrano expected Bultman to search Plaintiff where she thought it would be feasible for Plaintiff to hide narcotics. (Doc. 83-2) at 10, depo. at 114-15.

The search took place to the side of the motel in the parking lot to avoid the roadway. (Doc. 74-2) at 6, depo. at 41. Plaintiff remained in handcuffs during the search which lasted 1 to 1.5 minutes. (Doc. 79-4) at 5 and 8, depo. at 44 and 54. Deputies did not search Tencza's vehicle because of her cooperation.[1] (Doc. 81-2) at 6, depo. at 66. The entire encounter at the parking lot lasted about 90 minutes.[2] (Doc. 83-3) at 2, depo. at 39.

Connors drove Plaintiff to the North Substation but would not say where they were going except that they were going to a certain intersection. (Doc. 81-4) at 2. Plaintiff felt that she was going somewhere to be assaulted and killed. (Doc. 81-4) at 3-4. Although Connors told Plaintiff

---

[1] Medrano, however, testified at his deposition that he searched the vehicle for five to ten minutes while Sharp questioned Tencza and Plaintiff at the parking lot. (Doc. 81-3) at 6, depo. at 106-108.

[2] Medrano, on the other hand, testified at his deposition that he was in the parking lot a total of maybe 30 minutes. (Doc. 83-2) at 10, depo. at 117.

5

that he took Plaintiff's cell phone for his own protection, Plaintiff believed that Connors was a "fake officer" and had taken her cell phone so she could not call for help. (Doc. 81-4) at 4. Plaintiff, however, also noted that Conners treated her professionally and respectfully, and that he did not do anything improper. (Doc. 74-7) at 8 and 10, depo. at 167-68 and 219.

Once at the North Substation, Sharp and Medrano spoke with Tencza and Plaintiff, individually, in an office. (Doc. 74-2) at 10, depo. at 68; (Doc. 79-3) at 5, depo. at 123. When not being interviewed, Plaintiff was placed in a holding cell. (Doc. 79-3) at 5-6, depo. at 124-26. Additionally, Plaintiff's hands remained cuffed in front of her for the entire time she was at the substation. (Doc. 95-1) at 3, depo. at 69-70. Deputies subsequently left the North Substation with Tencza so she could show them the location of her supplier. (Doc. 74-2) at 10, depo. at 68-69. Deputies then took Tencza to execute the search warrant at 6604 Kelly NE. (Doc. 74-2) at 5, depo. at 35. At 4:05 p.m., the search warrant for 6604 Kelly NE was executed as well as a search warrant for the house across the street.[3] (Doc. 83-2) at 2 and 14, depo. at 47 and 131. According to Plaintiff, she remained at the North Substation and was not released from the North Substation until maybe 4:30 p.m. that afternoon (Doc. 74-7) at 13, depo. at 266.

Finally, Plaintiff attempts to discredit Sharp's credibility by presenting unsubstantiated deposition testimony by Nathan Harger that Sharp is a liar, that he has committed fraudulent acts, and that he discriminates against individuals on the basis of race. (Doc. 81-1) at 2; (Doc. 88-1) at 2-3, depo. at 17-18. Attacks on credibility, however, are misplaced because "'a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment.'"

---

[3] Although Sharp's search inventory log indicates that the search warrant was executed at 11:59 a.m. on September 14, 2011, Tencza testified at her deposition that after she and Plaintiff were released from the North Substation at maybe 4:00 p.m., they drove back to 6604 Kelly NE with a deputy who retrieved a box from Tencza at the residence. (Doc. 74-8) at 5, depo. at 166; (Doc. 79-5) at 3, depo. at 194-95. According to Tencza, that was the extent of the "search." (Doc. 79-5) at 3, depo. at 195.

*Faragalla v. Douglas County School Dist. RE 1*, 411 Fed. Appx. 140, 147 (10th Cir. 2011) (quoting *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000)).

B. *The Amended Complaint for the Recovery of Damages Caused by the Deprivation of Civil Rights (Amended Complaint) (Doc. 21)*

At issue in this Motion for Partial Summary Judgment is Count I of the Amended Complaint. In Count I, Plaintiff brings Section 1983 claims against all of the Defendants for violations of the Fourth Amendment. Specifically, Plaintiff alleges that (1) "Defendants did not have reasonable suspicion to stop and detain Plaintiff;" (2) "Defendants did not have reasonable suspicion or probable cause to conduct any search of Plaintiff or her property;" (3) "Defendants did not have probable cause to arrest Plaintiff;" and (4) "Defendants did not have reasonable suspicion, probable cause or any justifiable reason to conduct a strip search of Plaintiff." (Doc. 21) at ¶¶ 84-87. The Court construes these claims as follows: (1) the initial stop and detention of Plaintiff violated the Fourth Amendment; (2) the initial decision to search Plaintiff violated the Fourth Amendment; (3) the length and manner of Plaintiff's detention violated the Fourth Amendment; and (4) the scope of the search of Plaintiff as well as the manner and place of the search violated the Fourth Amendment. Defendants are seeking summary judgment only on the first two claims: that the initial stop and detention of Plaintiff violated the Fourth Amendment, and that the initial decision to search Plaintiff violated the Fourth Amendment. *See* (Doc. 75) at 6 n.3. Defendants claim that they are entitled to qualified immunity on those two claims.

C. *Standard of Review*

When a defendant moves for summary judgment on the basis of a qualified immunity defense, the Court "still view[s] the facts in the light most favorable to the non-moving party and resolve[s] all factual disputes and reasonable inferences in its favor." *Estate of Booker v. Gomez*, 745 F.3d 405, 411(10th Cir. 2014). Unlike other affirmative defenses, the plaintiff bears the

7

burden of overcoming the defense of qualified immunity. *Id*. At the summary judgment stage, the Court "must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Id.* The Court may in its discretion decide which of the two-parts of the qualified immunity test to address first. *Id.* at 412.

"[I]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). The plaintiff, however, "is not required to show that the very conduct in question has previously been held unlawful." *Sh. A. ex rel. J. A. v. Tucumcari Mun. Schools*, 321 F.3d 1285, 1287 (10th Cir. 2003). Furthermore, "[i]n determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'" *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Once the Court concludes that a right was "clearly established," then it becomes the "defendant's burden to prove that her conduct was nonetheless objectively reasonable." *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003) (citation omitted). Whether a defendant's conduct is objectively reasonable is a legal question while a factual question may arise when there is a dispute regarding the historical facts material to the objectively reasonable issue. *Id*.

*D. Discussion*

  *1. The Initial Stop and Detention of Plaintiff*

  Defendants contend that because Plaintiff was an occupant of 6604 Kelly NE, the search warrant for 6604 Kelly NE provided reasonable suspicion to stop and detain Plaintiff. As of September 14, 2011, an officer would have known that "[a]s long as a person is an occupant of the premises identified in a search warrant, officers have 'categorical' authority to detain him or her for the duration of the search." *United States v. Johnson*, 414 F. App'x 176, 179 (10th Cir. 2011) (citing *Muehler v. Mena*, 544 U.S. 93, 98 (2005)). Additionally, in 2007, the Tenth Circuit decided a case with similarities to this one. In *United States v. Castro-Portillo*, a magistrate issued a residential search warrant for drugs, money, guns, and other items. 211 F. App'x 715, 717 (10th Cir. 2007). Castro-Portillo was not named as a target in the search warrant. *Id.* During surveillance of the residence, a law enforcement agent saw Castro-Portillo at the residence. *Id.* Shortly, thereafter, an officer saw a man and woman leave the residence in a car and begin to drive away. *Id.* The officer stopped the car two blocks from the residence because he believed the target of the search warrant was in the vehicle. *Id.* In fact, Castro-Portillo was driving the vehicle and his wife was a passenger. *Id.* The officer also believed that since the vehicle left the target house there may be guns or drugs in the vehicle. *Id.* For safety reasons, the officers ordered Castro-Portillo to exit the vehicle, handcuffed him, and conducted a weapons search. *Id.* Castro-Portillo and his wife were then taken back to the residence where authorities were searching the residence. *Id.* Once authorities concluded the search, they transported Castro-Portillo to the police station where he admitted to illegal activities. *Id.* at 717-18.

  The Tenth Circuit held that

> it is plain the search warrant in this case carried with it the limited authority to detain Mr. Castro–Portillo as an occupant during the search of the house. This alone was sufficient

9

> to detain him during the entirety of the search. The fact he was not observed committing a crime at the time of the stop, drove away from the house moments before the execution of the search warrant, and did not know about the search warrant did not prevent authorities from having the requisite suspicion to stop him….

*Id*. at 721. Moreover, the Tenth Circuit noted that the officer detained Castro-Portillo as soon as practicable after he left the residence. *Id.* The Tenth Circuit further concluded that Castro-Portillo's "handcuffed detention was justified by a substantial governmental interest in minimizing the risk of harm to authorities who reasonably believed he might possess a gun or otherwise might present some danger to the officers during the course of the entire search, both while he was detained street-side and later when authorities returned him to the house." *Id.* at 723.

The United States Supreme Court recently observed, however, that Federal Courts of Appeals have reached differing conclusions as to whether officers can lawfully detain "occupants beyond the immediate vicinity of the premises covered by a search warrant." *Bailey v. United States*, 133 S.Ct. 1031, 1037 (2013). Because this law is not settled, the law is not clearly established. Moreover, in light of *Johnson* and *Castro-Portillo*, Defendants' initial stop and detention of Plaintiff was objectively reasonable. Plaintiff has not persuaded the Court that she meets the second prong for defeating Defendants' qualified immunity defense on the claim that the initial stop and detention of Plaintiff violated the Fourth Amendment. Consequently, Defendants are entitled to summary judgment on that claim.

    2. *The Initial Decision to Search Plaintiff for Weapons and Drugs*

        (a) *Connors and Bultman*

Defendants correctly contend that to be liable under Section 1983 an individual must have been personally involved in the alleged constitutional violation. *Foote v. Spiegel*, 118 F.3d 1416, 1423-24 (10th Cir. 1997). Viewing the evidence in the light most favorable to Plaintiff, a

reasonable jury could find that neither Connors nor Bultman were personally involved in the initial decision to search Plaintiff for either weapons or drugs.  Instead, a reasonable jury could find that Sharp and Medrano made the initial decisions to have Bultman search Plaintiff for contraband.  Consequently, qualified immunity applies to the claim that Connors and Bultman initially decided to search Plaintiff.

Additionally, officers have a good faith defense when they reasonably rely upon the collective knowledge doctrine to conduct a search.  *Felders v. Bairett*, 885 F.Supp.2d 1191, 1206 (D. Utah 2012), *aff'd sub nom. Felders ex rel. Smedley v. Malcom*, 755 F.3d 870 (10th Cir. 2014).  Here, a reasonable jury, viewing the evidence in the light most favorable to Plaintiff, could find that Sharp and Medrano had knowledge, which Connors and Bultman did not have, regarding events which occurred prior to Connors stopping Tencza's vehicle in the parking lot.  A reasonable jury could, therefore, find that Connors and Bultman reasonably relied on Sharp and Medrano's knowledge of the situation and their subsequent decisions to search Plaintiff for contraband.  Hence, a reasonable jury could find that Connors and Bultman have a good faith defense with respect to the claim that their initial decision to search Plaintiff for weapons and drugs violated the Fourth Amendment.  Connors and Bultman are, therefore, entitled to summary judgment on that claim.

    *(b)  Sharp and Medrano*

      *(1)  The Initial Decision to Search for Weapons*

Sharp and Medrano's initial decision to search Plaintiff can be broken down into two components:  (1) the initial decision to search Plaintiff for weapons; and (2) the initial decision to search Plaintiff for drugs.  Regarding an initial decision to search Plaintiff for weapons, the Second Circuit held in 2006 that when a police officer transports an individual, "the police may

carry out a departmental policy, imposed for reasons of officer safety, by patting down that person." *United States v. McCargo*, 464 F.3d 192, 202 (2d Cir. 2006).  In addition, in 2008, the Tenth Circuit held that the limited purpose of a pat-down search is "'to allow the officer to pursue his investigation without fear of violence.'" *United States v. Sanchez*, 519 F.3d 1208, 1216 (10th Cir. 2008) (citation omitted).  Moreover, the New Mexico Supreme Court held in 1999 that conducting a *Terry* pat-down of an individual prior to placing him in a patrol car is justifiable.  *State v. Paul T.*, 1999-NMSC-037, ¶ 16, 128 N.M. 360.  Considering this clearly established law, Sharp and Medrano's initial decision to search Plaintiff for weapons prior to placing her in Connors' patrol car did not violate the Fourth Amendment and was objectively reasonable.  Sharp and Medrano are, therefore, entitled to qualified immunity and summary judgment with respect to the claim that their initial decision to have Plaintiff searched for weapons violated the Fourth Amendment.  This conclusion, however, does not address the outstanding question of whether the scope of the search for weapons violated the Fourth Amendment, a question not presented in this Motion for Partial Summary Judgment.

*(2)  The Initial Decision to Search for Drugs*

Had Sharp and Medrano contemplated only a *Terry* pat-down for weapons and had incidentally found drugs on Plaintiff, then Sharp and Medrano would have been justified in deciding to conduct a full search of Plaintiff's person incident to a lawful arrest.  *See, e.g., United States v. Laurent*, 607 F.3d 895, 903 (1st Cir. 2010).  However, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Sharp and Medrano contemplated more than a pat-down of Plaintiff in order to search for drugs.  That decision to search Plaintiff using more than a pat-down is subject to a probable cause standard.

It is clearly established that simply being near a person suspected of criminal activity is not enough to provide probable cause to search that person. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). An officer must have "probable cause particularized with respect to that person." *Id.* In this case, a reasonable jury, viewing the evidence in the light most favorable to Plaintiff, could find that neither Sharp nor Medrano had probable cause to believe that Plaintiff had drugs on her person. There being "room for a difference of opinion" on the issue of probable cause precludes the Court from determining that Sharp and Medrano are entitled to qualified immunity on the claim that their initial decision to search Plaintiff for drugs violated the Fourth Amendment. *See Bruner v. Baker*, 506 F.3d 1021, 1028 (10th Cir. 2007) ("where there is a question of fact or 'room for a difference of opinion' about the existence of probable cause, it is a proper question for a jury….) (citation omitted).

IT IS ORDERED that

1. County Defendants' Motion for Partial Summary Judgment No. II on Count I of Gahan's Amended Complaint Alleging Search and Seizure Without Probable (Doc. 75) is granted in part;

2. summary judgment will be entered in favor of Defendants on the Count I claim that they violated the Fourth Amendment when they initially stopped and detained Plaintiff;

3. summary judgment will be entered in favor of Connors and Bultman on the Count I claim that they violated the Fourth Amendment when they initially decided to search Plaintiff for weapons and drugs;

4. summary judgment will be entered in favor of Sharp and Medrano on the Count I claim that they violated the Fourth Amendment when they initially decided to search Plaintiff for weapons; and

5. the above claims will be dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

14